**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ADAM AMATO, : | CIVIL ACTION NO. |
| : | |
| Plaintiff, : | |
| : | |
| v. : | **JURY TRIAL DEMANDED** |
| : | |
| SHAKERS INC. D/B/A SHAKER'S KIA : | |
| : | JULY 24, 2020 |
| Defendant. : | |

**COMPLAINT**

**JURISDICTION AND VENUE**

1. This action arises under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), codified as amended at 42 U.S.C. § 12101 et seq.; and Connecticut state law.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resided in this district at all times relevant.

4. Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

5. Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

6. Plaintiff received a Notice of Right to Sue on April 27, 2020.

## PLAINTIFF

7. The Plaintiff, Adam Amato ("Amato" or "Plaintiff") is a natural person and a resident of the State of Connecticut.

## DEFENDANT

8. The Defendant, Shakers, Inc. d/b/a Shaker's Kia ("Shakers") is a Connecticut Corporation, incorporated at 831 Straits Tpke, Watertown, CT, is registered with the Connecticut Secretary of State, and conducts substantial business in the State of Connecticut at 1230 Main St, Watertown, CT, where Plaintiff was employed.

9. The Defendant employs more than twenty (20) employees.

## INTRODUCTION

10. By way of background, Amato holds two educational degrees and a myriad of scholastic achievements. Specific to the duties of his former position at Shakers, he achieved a "Certificate of Achievement" for successfully attaining Kia University Certification as a "Sales Consultant, Professional Elite" from 2015-2019. He also received substantial positive feedback from the clients he had served during his tenure at Shakers. Yet, Amato, who suffers from Bipolar disorder, anxiety, and manic disorder, was treated disparately at work, set-up for failure, and eventually terminated under the guise of performance.

11. Tellingly, Shakers neither accommodated Amato nor engaged in the mandated ADAAA mandated "interactive dialogue," swearing under oath in its submission to the Connecticut Commission on Human Rights and Opportunities (CHRO) that it was **unaware** of Amato's disability. Contrary to this assertion, Shakers

-2-

documented and produced internal Memorandum, dated May 9, 2019, unequivocally states that "Amato disclose[d] that he **suffers from mental disorder and that he is Bipolar**. …"  This internal memorandum, produced approximately one month before Amato's termination belies Shakers' position. On May 31, 2019, Amato was wrongfully terminated and Shakers, by its own admission, knew of his mental disability.

**FACTUAL ALLEGATIONS**

12. Amato suffers from Bipolar disorder, anxiety, and manic disorder.

13. Shakers is a vehicle dealership.

14. In January 2014, Shakers hired Amato as a Product Specialist at its Watertown dealership.

15. At all times relevant, Corey Shaker ("Corey") (no known disability) was, and still is, the President of Shakers.

16. In January 2019, Shakers underwent management and staffing changes in the dealership in which Amato was employed.

17. In February 2019, James Scarzenaski ("Scarzenaski") became the General Manager of the Watertown dealership.

18. During this time of staffing changes, Amato began to experience episodes of his mental disorder due to the instability of the dealership.

19. On February 4, 2019, Amato complained to Scarzenaski that the symptoms of his medical condition had been exacerbated by the aforementioned staffing changes.

20. During that meeting, Amato asked Scarzenaski if he could temporarily be transferred into a less stressful position, which would enable him to get his medical

-3-

condition under control.

21. After Skarzenski learned of Amato's disability, he began to intentionally divert Amato's sales to other employees such as Michelle Croft (no known disability) and Howard Danoff, (no known disability).

22. Amato complained to Corey Shaker, Principal Owner, that Skarzenski had been diverting his potential clients to other employees in sales.

23. At that time, Amato also informed Corey Shaker of his mental disability and Bipolar disability and further stated that the stress of being treated disparately by Skarzenski, along with the staff changes had exacerbated his mental condition and that he had been seeking mental health treatment.

24. Despite this, Corey Shaker neither remedied the situation nor engaged in the ADAAA, required "interactive process."

25. In mid-February of 2019, Scarzenaski advised Amato that there was going to be a new position available, Kia Concierge for all new car deliveries—a potential solution to Amato's issues.

26. Scarzenaski then provided Amato with a job description for the Concierge position, along with a pay plan.

27. Corey Shaker subsequently advised Amato that this position was his.

28. Yet, in March of 2019, a month later, Amato was still performing his duties as a Products Specialist. Amato was never actually offered the Concierge position he had been promised.

29. Between March and May 2019, still performing as a Product Specialist, there was a sharp decline in Amato's resources that would allow him to effectively perform

his job.

30. With a complete and utter lack of resources, Amato was still expected to sell vehicles at the same pace as the other non-disabled employees in sales.

31. On top of this, as previously stated, many of Amato's sales had already been diverted to other employees in sales, making his sales goals unfeasible at best; more realistic, a set up for failure.

32. On May 6, 2019, through May 9, 2019, Amato was required to be out of work to take care of his ill spouse.

33. According to Skarzenski, in an internal memorandum he authored on May 9, 2019, just weeks before Amato's termination, Skarzenski had a meeting with Amato and Nicole Cherubini ("Cherubini"), Sales Manager, to allegedly discuss Amato's work performance.

34. This May 9, 2019 memorandum is signed by Skarzenski and Cherubini and drafted contemporaneously at the time of the events. At that meeting, Amato received a write-up after having to take time off to care for his ill spouse.

35. The write-up advised Amato that he had to sell 10 cars by the end of the month of May or he would be terminated, a clear set up for failure, and plan to terminate him.

36. In Skarzenski's own memorialized words, at that meeting,

**Amato disclose[d] that he suffers from mental disorder and that he is Bipolar. …** [Amato] also went on to [state] there is a 'stigma' towards people whom suffer from mental disorders and didn't want to be treated differently. [Amato] also said that he couldn't control his medication and symptoms and that all the changes at Kia were making his disorder act up.

(emphasis supplied)

37. Yet, in sharp contrast to reality, in Shakers sworn Answer to the CHRO, it stated

-5-

that **"[a]t no time during his employment** did [Amato] advise [Shakers] of his purported disability or mention a mental disability or bipolar **until he was terminated**…." (emphasis supplied); (Shakers' August 8, 2019 Answer to CHRO Complaint, ¶ 9.)

38. This is undercut by Scarzenaski's own statement on May 9 which he clearly states that: (i) Amato informed him and Cherubini of his mental disability; (ii) informed them of his bipolar disability; and (iii) informed them that all the changes at Kia were making his disorder act up.

39. At this time, similar to before, Shakers never engaged in the "interactive process" and failed to accommodate Amato, despite knowing of his mental disability on May 9, 2019, at the absolute latest.

40. In addition, according to Scarzenaski's May 9, 2019 statement, Amato, also again requested the new position as the Concierge he had previously spoken to Scarzenaski about. Now, for the first time, Scarzenaski informed Amato that the position was unavailable

41. During this same meeting, Amato requested a medical leave of absence as an accommodation, which, was not responded to. Similar to multiple times before, Shakers never engaged in the ADAAA required "interactive process."

42. Shakers, fully aware that Amato's Bipolar Disorder was the cause of his performance, simply gave Amato the weekend off to "recover," which, at best, is a very temporary patch to a permanent mental health issue.

43. Rather than offering Amato an accommodation, that very same day of the May 9 meeting, Shakers issued Amato a "final warning" and drastically reduced Amato's

-6-

pay from $600.00 to $300.00 per week, and forced him to sign a "Pay Plan" formalizing that pay cut.

44. Shakers, while denying knowledge of Amato's mental health condition, also admitted to receiving a note from Amato's doctor on May 2, 2019, which Shakers claims was not informative of Amato's psychiatric disability. Amato's doctor's note, dated May 2, 2019—one month prior to termination—was from "**The Healthy Mind Psychiatric Services**." The caption of his doctor's note, The Healthy Mind Psychiatric Services, was also circled, presumably by the Defendant, drawing attention to the title and was sufficient to make the Defendant aware of Amato's mental disability. Shakers did not engage in the ADAAA "interactive dialogue" at this point.

45. Shakers also admits receiving cellular text messages from Amato prior to his termination from the company which is documented. Amato's text messages to Skarzenski read that,

> last year after new management came in I suffered some personal issues that had a major affect on my mental fortitude, and in the end after essentially begging for help with this I've been denied (*sic*). … I did expect someone to reach out in a capacity other than punishing me. … my mind was my biggest enemy, and although I once again reached out for help [and] I am facing an eminent termination on Saturday. … I feel in a sales position at Shakers with my mental condition, I will not be allowed money I need for my family to survive … March I did 82 videos for customers, April when my position was to start I was given 8 videos, this month I believe it's 2 videos so far. I don't know why but it seems like I've been villified (*sic.*) when all I did was show up and try [my] best day to day. You as well as upper management knew about my Bipolar yet here I am 2 days from termination and no reprieve. … Like I said look at the videos this month , you guy's didn't give me chance.

46. Amato's text messages further stated that Amato "get[s] CRIPPLING anxiety … [his] anxiety gets that bad … [and] when your support system is as thin as mine the

anxiety takes hold longer, and is more irrational."

47. Shakers did not engage in the ADAAA "interactive process" at this point either; instead, after receiving Amato's text message, Skarzenski remarked, "[Amato] said he has anxiety not depression or bipolar or mental illness or mental disorder…."

48. Scarzenaski's statement indicates a clear misunderstanding of Bipolar Disorder, the extent of Amato's disability, and an absolute lack of care to accommodate him. Similar to before, no accommodation was offered even after receiving the aforementioned text messages prior to Amato's termination

49. In words or substance, on or about May 9, Amato stated to Skarzenski, via text message, I have Bipolar and you're not going to help?

50. Skarzenski's plan to terminate Amato came to fruition—Amato could not sell the 10 cars by the end of the month—and on May 31, 2019, Amato was terminated.

51. Selling 10 cars in 14 days at a dealership that sold approximately only 30 cars in total the two months prior is an impossibility.

52. Amato was not given the proper resources to sell; yet, he was expected to sell vehicles at the same pace as the others in sales. For instance, videos are daily live leads that are distributed to the sales staff. Once a call is placed by the call center, an employee from sales follows up with a video of the car the potential customer wants— it was a very valuable sales tool.

53. In March Amato did 82 videos for customers.  In April when his position was to start, he was given only 8 videos, and in May he was given a mere 2 videos.

54. When Amato's video leads stopped, he was reduced to "cold calling," i.e. making an unsolicited call to someone, by telephone or in-person, in an attempt to sell

goods or services. Calling a potential customer without a video lead significantly reduces the odds of selling in comparison to live leads, drastically, to say the least.

55. Other similarly situated employees who did not have mental disabilities and underperformed had not been terminated. These employees were: Matt DiFazio (no known disability), Product Specialist; Zach Palmer (no known disability), Product Specialist; John Evans (no known disability), Sales Manager; William LaRovera Jr., (no known disability) Sales Manager; and Maya (last name unknown) (no known disability), Product Specialist; and Jeff Belanger (no known disability), the former General Manager.

## COUNT ONE

### DISABILITY DISCRIMINATION, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT

56. Plaintiff hereby incorporates Paragraphs 1-55, with the same force and impact as if fully set forth herein.

57. Amato suffers from Bipolar disorder, anxiety, and manic disorder—protected disabilities.

58. Shakers treated Plaintiff in a disparate manner in the terms and conditions of his employment based upon his disability, including, but not limited to the following:

   a) On May 9, 2019, Shakers issued Amato a "final warning" and drastically reduced Amato's pay from $600.00 to $300.00 per week, and forced him to sign a "Pay Plan."

   b) Shakers stripped Amato of his ability to perform his job by diverting sales and not proving him with sufficient leads.

    c) On May 31, 2019, Shakers terminated Amato fully aware of his mental disability.

    d) Failing to engage in the ADAAA mandated "interactive process."

    e) Failing to Accommodate his known disability.

59. As a result of his wrongful discharge, Amato has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

60. Plaintiff seeks compensatory and punitive damages for Defendant's misconduct

### COUNT TWO

### RETALIATION, IN VIOLATION OF THE ADAAA

61. Plaintiff incorporates paragraphs 1-60, with the same force and impact as if fully set forth herein at length.

62. Among other factors that motivated Shakers termination of Amato was retaliation due to his multiple requests and persistence for an accommodation.

63. As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

64. Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT THREE

### FAILURE TO ACCOMMODATE, FAILURE TO ENGAGE IN THE "INTERACTIVE PROCESS," IN VIOLATION OF THE ADAAA

65. Plaintiff hereby incorporates Paragraphs 1-64 with the same force and impact as if set forth in full herein.

66. Shakers failed to engage in the interactive process, failed to accommodate Plaintiff, and terminated his employment on May 31, 2019

67. As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

68. Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT FOUR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

69. Plaintiff hereby incorporates paragraphs 1-68 with the same force and impact as if fully set forth herein.

70. Shakers aforementioned conduct was extreme and outrageous.

71. Defendant knew that the above-incorporated conduct would likely result in the severe emotional distress of the Plaintiff.

72. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

73. Plaintiff seeks damages as a result of Defendant's unlawful conduct

### **PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1. Money damages;

2. Costs;

3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest

5. Trial by jury; and

6. Such other relief as the Court deems just, fair, and equitable.

THE PLAINTIFF,
ADAM AMATO

By: _____/s/_____
Michael C. McMinn (#ct27169)
**THE MCMINN EMPLOYMENT LAW FIRM, LLC**
1000 Lafayette Blvd., Suite 1100
Bridgeport, CT 06604
Tel: (203) 683-6007
Fax: (203) 680-9881
michael@mcminnemploymentlaw.com

*COUNSEL FOR PLAINTIFF*